BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
BRITTNEY CAMPBELL, NORTH CAROLINA STATE BAR NO. 31433
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST., SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211

U.S. COURTS

OCT 21 2025

Rcvd____Filed____Time____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAWN CUTTING,<br><br>Defendant. | Case No. CR 25-0288-NAKB<br><br>**INDICTMENT**<br><br>18 U.S.C. § 1343<br>18 U.S.C. § 1349<br>26 U.S.C. § 7201<br>26 U.S.C. § 7203<br>18 U.S.C. § 981(a)(1)(D)<br>18 U.S.C. § 982(a)(2)<br>28 U.S.C. § 2461 |

The Grand Jury charges:

At times relevant to this Indictment:

INTRODUCTION AND BACKGROUND

**Relevant Entities and Individuals**

1.  Defendant, SHAWN CUTTING, was a resident of Idaho.

2.  Unindicted Conspirator-1 (UC-1), was a resident of Idaho.

3.  Crypto Traders Management, LLC (CTM), was a purported cryptocurrency investment fund that was registered in Idaho in around January 2018. CUTTING owned

INDICTMENT - 1

and controlled CTM.

4. Lakeview Trust was a purported trust owned and controlled by CUTTING.

5. Tyson Trust was a purported trust owned and controlled by CUTTING.

### Relevant Terms and Definitions

6. "Virtual currency" or "cryptocurrency" was a form of online payment that uses cryptography to secure financial transactions. Cryptocurrency transactions may be recorded on a "blockchain," which is a cryptographically verified ledger of every transaction that occurs in a particular currency. Cryptocurrency transactions can be conducted with multiple inputs and multiple outputs to a single transaction. Cryptocurrency transactions take place between "addresses" on a blockchain, and a transfer of funds from a sender to a recipient may be broken into multiple transactions that follow different paths to the same destination. One individual may control multiple "addresses," sometimes all as part of a single "account" or "wallet."

7. "Bitcoin," or BTC, was a common form of cryptocurrency. The BTC blockchain, or ledger, is publicly available. Users can view the movement of BTC from one "address" to another on the BTC blockchain. The BTC blockchain identifies the addresses and BTC amounts involved in transactions but does not identify who owned or controlled a particular address at any particular time. A BTC "Transaction ID number" uniquely identifies a particular BTC transaction. A BTC deposit address is a unique identifier that serves as a virtual location to which BTC can be sent. Most BTC users employ software that creates and manages a "wallet." The wallet software creates and controls "addresses" that are used to hold, send, and receive BTC.

8. "Altcoins" was a term used to refer to cryptocurrency and tokens that are not

INDICTMENT - 2

Bitcoin. Altcoins are a typically speculative segment of the cryptocurrency market, offering a wide range of investment opportunities. Because their value can fluctuate significantly, they typically are a high risk, high-reward investment.

9. A "virtual currency exchange," also known as a "cryptocurrency exchange," was a business that functioned to allow customers to purchase, sell or trade virtual currencies, including for other forms of value, such as conventional fiat money.

The Internal Revenue Service and Its Forms

10. The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury, responsible for administering and enforcing the tax laws of the United States.

11. A U.S. Individual Income Tax Return, Form 1040 ("Form 1040") was an IRS form individual U.S. taxpayers used to report their income, gains, losses, deductions and credits, as well as to determine their income tax liability.

12. Schedule C, Profit or Loss from a Business ("Schedule C") was an IRS form individual U.S. taxpayers used to report income or loss from a business the taxpayer operated or a profession the taxpayer practiced as a sole proprietor.

13. IRS Form 1065, U.S. Return of Partnership Income ("Form 1065") was used by partnerships to file an annual income tax return. Under the Internal Revenue Code and associated regulations, a domestic LLC with at least two members (a "multi-member LLC") was classified as a partnership for federal income tax purposes unless it elected to be treated as a corporation.

14. IRS Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041") was used by some trusts and estates to file an annual income tax return.

INDICTMENT - 3

15.     Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1065 and used by certain business entities to report a partner's share of income and deductions.

## COUNT ONE
### Conspiracy to Commit Wire Fraud
### 18 U.S.C. § 1349

16.     The Grand Jury re-alleges and incorporates by reference the factual allegations in paragraphs one through nine of this Indictment.

17.     Beginning in or around at least August 2017 and continuing to at least in or around March 2021, in the District of Idaho and elsewhere, the defendant, SHAWN CUTTING and UC-1, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree to commit wire fraud, that is: devise and intend to devise a scheme and artifice to defraud as to material matters, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, in so doing, caused interstate and foreign wire communications to be made, in furtherance of the scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

### Manner and Means

18.     To further the objects and goals of the scheme, the defendant, SHAWN CUTTING, UC-1, and others carried out the scheme through the following manner and means, among others:

   a.     CUTTING began operating a purported cryptocurrency investment business in 2017 under the name Crypto Traders Club (CTC). CUTTING solicited investors to invest in digital assets, representing orally and in emails to potential investors

that he had successfully traded in digital assets and that he would pool investor deposits into a fund, invest in digital assets, and then share profits with investors.

      b.      CUTTING claimed he had been a financial advisor for years and that he held multiple securities licenses.

      c.      Through in-person meetings, emails, and referrals, CUTTING and UC-1 solicited prospective investors (hereinafter, "victim-investors") to entrust their fiat currency and cryptocurrency (collectively, the "funds") to CUTTING for CUTTING to invest/trade on the victim-investors' behalf.

      d.      In or around January 2018, CUTTING founded CTM and transferred any CTC investors to CTM and continued soliciting and receiving new investor funds through at least May 2020.

      e.      CUTTING falsely represented that victim-investors' funds would immediately go to cryptocurrency exchanges and be placed in trading.

      f.      CUTTING and UC-1 sent email communications to victim-investors outlining the purported use of their funds and provided monthly newsletters and individualized "Earnings Updates." The Earnings Updates showed each individual investor's account values with fields for "earnings," "deposits," "withdrawals," and "active

INDICTMENT - 5

investment." The earning updates consistently showed rapid growth and typically included a hyperlink to an online link through which recipients could invest additional funds.

  g. CUTTING falsely represented to victim-investors that their investments were growing in value and encouraged victim-investors not to redeem their purported "profits" but, instead leave their investment funds with CUTTING.

  h. CUTTING did not in fact trade cryptocurrency using victim-investors' funds to generate profits as CUTTING and his coconspirators represented and promised. In fact, CUTTING and UC-1 were operating an illegal investment fraud scheme and using investor funds for their personal benefit. For example:

    i. On or about July 19, 2019, Victim Investor-8 invested $500,000, which was deposited into CTM's bank account. Within days, CUTTING transferred $300,000 to a bank account held in the name of Golden Cross, CUTTING's personal investment company. CUTTING also used approximately $100,000 of Victim Investor 8's funds to make payments to other investors requesting withdrawals.

    ii. On or about October 9, 2019, Victim Investor-9 invested $44,000, which was deposited into CTM's bank account. Within one week, CUTTING transferred $25,000 to a bank account held in the name of Tyson Trust, a trust owned and controlled by CUTTING. CUTTING also used $12,900 of Victim Investor-9's funds to make payments to other investors requesting withdrawals.

    iii. On or about January 3, 2020, Victim Investor-10 invested $30,000, which CUTTING deposited into a bank account held in the name of Golden

INDICTMENT - 6

Cross. CUTTING then used $28,907.25 of Victim Investor-10's funds to make a payment to American Express.

    i.    When victim-investors demanded the return of their initial investment and the profits, CUTTING made various false representations about the reason he could not repay victim-investors until some later time, including, but not limited to:

        i.    Cryptocurrency exchanges set withdrawal limits which prevented CTM from honoring every withdrawal request due to it having reached its withdrawal limit for a given month;

        ii.    Newly enacted laws prevented cryptocurrency exchanges from releasing any funds to CTM until every CTM investor-victim had completed required know your customer paperwork including certain tax forms and a signed agreement;

        iii.    A "top 5" cryptocurrency exchange was shut down, causing a loss to CTM of $900,000;

        iv.    Other cryptocurrency exchanges CTM used were "hacked;"

        v.    CTM itself was defrauded when a "hacker" fraudulently submitted more than $100,000 of withdrawal requests;

        vi.    A Bitcoin broker "stole" $100,000 from CTM; and

        vii.    The SEC's lawsuit against CUTTING for fraud prevented CUTTING from returning funds to victim-investors.

    j.    To conceal and continue the scheme to defraud, CUTTING used new investor-victim funds to redeem prior investor-victims.

    k.    In total CUTTING fraudulently obtained at least $3.6 million from more than 400 victim-investors.

INDICTMENT - 7

All in violation of 18 U.S.C. § 1349.

## COUNTS TWO THROUGH FOURTEEN
### Wire Fraud
### 18 U.S.C. § 1343

19. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through nine and 18 of this Indictment.

20. Beginning in or around at least August 2017 and continuing until at least in or around March 2021, in the District of Idaho and elsewhere, the defendant, SHAWN CUTTING, knowingly participated in, devised, and intended to devise, a scheme and artifice to defraud as to material matters, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, that is a scheme to defraud victim-investors.

### Manner and Means

21. To further the objects and goals of the scheme, the defendant, SHAWN CUTTING, carried out the scheme through the manner and means described in paragraph 18 of this Indictment, among others.

### Executions of the Scheme

22. On or about the dates set forth below, in the District of Idaho and elsewhere, the defendant, SHAWN CUTTING, for the purpose of executing, and attempting to execute the scheme described above, did knowingly transmit, and cause to be transmitted, by means of wire communication in interstate commerce the writings, signs, signals and

sounds described below for each count, each transmission constituting a separate count of this Indictment:

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
| 2 | November 16, 2020 | Deposit of check no. 00207 x6451 in the amount of $5,000 from Mountain West Bank account ending in into Victim Investors-7's First Interstate Bank account |
| 3 | November 16, 2020 | Deposit of check no. 002006 in the amount of $12,500 from Mountain West Bank account ending in x6451 to Victim Investors- 2 and 3's Wells Fargo account ending in x0665 |
| 4 | November 17, 2020 | Interstate wire transferring approximately $1,030 from American Express Account No. x1008 to Victim-Investor-1's CashApp Account |
| 5 | December 15, 2020 | Deposit of check no. 0006 in the amount of $12,500 from Wells Fargo Bank account ending in x1941 to Victim Investors- 2 and 3's Wells Fargo bank account |
| 6 | December 16, 2020 | Interstate wire transferring approximately $1,500 from American Express Account No. x1008 to Victim-Investor-4's CashApp Account |
| 7 | December 17, 2020 | Interstate wire in the approximate amount of 0.21811558 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 4's Bitcoin Wallet ending in p7Zx |
| 8 | December 17, 2020 | Interstate wire in the approximate amount of 0.21514204 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 4's Bitcoin Wallet ending in p7Zx |
| 9 | December 23, 2020 | Deposit of check no. 1511 in the amount of $10,000 from Washington Federal Bank account ending in x1248 to Victim-Investors 5 and 6's Numerica Credit Union account ending in x7380 |
| 10 | January 27, 2021 | Interstate wire in the approximate amount of 0.06506043 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 7's Bitcoin Wallet ending in 3kh5 |
| 11 | February 10, 2021 | Interstate wire in the approximate amount of 0.03355872 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 4's Bitcoin Wallet ending in D4RF |
| 12 | February 19, 2021 | Interstate wire in the approximate amount of 0.1176665 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 2's Bitcoin Wallet ending in L66c |
| 13 | February 19, 2021 | Interstate wire in the approximate amount of |

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
|  |  | 0.1094603 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 2's Bitcoin Wallet ending in L66c |
| 14 | March 3, 2021 | Interstate wire in the approximate amount of 0.0388283 BTC from CUTTING's Coinbase USERID ending in 8af9 to Victim 1's Bitcoin Wallet ending in ugpf |

All in violation of 18 U.S.C. § 1343.

## COUNT FIFTEEN
### Attempt to Evade or Defeat Tax
### 26 U.S.C.§ 7201

23.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 15 and 18 of this Indictment.

24.   On or about April 25, 2019, CUTTING, filed a Form 1040, for the 2018 tax year, reporting $289,104 in total income and a tax liability of $57,345. CUTTING reported CTM's income on a Schedule C. CUTTING did not make any payments towards his tax liability to the IRS during 2018, at the time of filing, or any time after the filing.

25.   On or about June 3, 2019, the IRS sent CUTTING a notice stating that CUTTING and his spouse had a balance due of $60,983.57 for the 2018 tax year.

26.   On or about July 8, 2019, the IRS sent CUTTING a second notice stating the balance due for 2018 was $61,608.70.

27.   In or around October 2019, CUTTING consulted with a tax and accounting firm located in Dallas, Texas (the "Tax Firm"). The Tax Firm provided CUTTING with the option to resolve his tax liability by entering into an installment agreement with the IRS.

28. Instead of making payment to the IRS toward his 2018 tax liabilities, CUTTING hired the Tax Firm to amend his prior 2018 Form 1040, restructure his business CTM, and fraudulently reduce his tax liability for the 2018 tax year.

29. Specifically, and as described below, CUTTING, with the assistance of the Tax Firm, assigned nearly all income generated by CTM — income that was previously reported on CUTTING's Form 1040— to a partnership tax return filed by CTM. Most of the income reported on the CTM partnership return was passed through a series of trust tax returns that claimed false deductions that eliminated all reported income. This abusive tax trust structure operated as follows:

   a. On or about February 5, 2020, CUTTING filed and caused to be filed CTM's first and only Form 1065 (the "CTM Partnership Return"), on behalf of CTM, that reported $289,104 of ordinary business income, the same amount of total income that was previously reported on CUTTING's Form 1040. The CTM Partnership Return identified the following two partners: 1) CUTTING (10%); and 2) Tyson Trust (90%). CTM issued Schedules K to the two partners, distributing the partnership income as follows: CUTTING ($28,910) and Tyson Trust ($260,194).

   b. On or about February 5, 2020, CUTTING filed and caused to be filed Tyson Trust's first and only Form 1041, reporting $260,194 of total income. The Form 1041 also reported an income distribution deduction and issued a Form K-1 to Lake View Trust—the 100% beneficiary of the Tyson Trust— in the amount of $260,194.

   c. On or about February 5, 2020, CUTTING filed and caused to be filed Lake View Trust's first and only Form 1041, on behalf of Lake View Trust that reported total income of $260,194. The return then reported a fraudulent deduction in the amount of

INDICTMENT - 11

$260,194, thereby eliminating the entire amount of taxable income reported on Lake View Trust's tax return.

   d. On or about March 11, 2020, CUTTING filed and caused to be filed a Form 1040X, *Amended U.S. Individual Tax Return*, to amend his original Form 1040 for the tax year 2018. The Form 1040X reported CUTTING's 10% partnership distribution from CTM in the amount of $28,910 and total tax liability due in the amount of $4,454. CUTTING has not paid the tax liability due and owing as reported on his amended 2018 Form 1040.

  30. From on or about June 30, 2019, and continuing thereafter up to on or about the date of this Indictment, in the District of Idaho and elsewhere, the defendant, SHAWN CUTTING, did willfully attempt to evade and defeat the payment of a large part of the income tax, penalties, and interest due and owing by him to the United States of America for the calendar year 2018, by committing affirmative acts of evasion, including but not limited to:

   a. causing CTM to be converted to a partnership entity for tax purposes and fraudulently issuing Forms K-1 that passed through the partnership income to two trusts CUTTING controlled: Tyson Trust and Lake View Trust;

   b. filing a false Form 1041 on behalf of Tyson Trust that reported a fraudulent tax deduction in the amount of $260,194;

   c. filing a false Form 1041 on behalf of Lake View Trust that reported a fraudulent tax deduction in the amount of $260,194; and

   c. filing a false Form 1040x underreporting CUTTING's true income.

All in violation of Title 26, United States Code, Section 7201.

## COUNTS SIXTEEN THROUGH SEVENTEEN
### Willful Failure to File Return
### 26 U.S.C. § 7203

31. The allegations contained in paragraphs one through 15 and 18 are realleged and incorporated as if fully set forth in this paragraph.

32. During the calendar years set forth below, the defendant, SHAWN CUTTING, had and received gross income in excess of the amounts of minimum gross income set forth below. By reason of such gross income, he was required by law, following the close of the calendar year and on or before the due dates set forth below, to make an income tax return to the IRS, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Well knowing all of the foregoing, the defendant, SHAWN CUTTING, did willfully fail, on or about the dates set forth below, in the District of Idaho and elsewhere, to make an income tax return as required by law:

| Count | Calendar Year of Tax Return | Minimum Gross Income | Due Date of Return |
|---|---|---|---|
| 16 | 2019 | $24,400 | July 15, 2020 |
| 17 | 2020 | $24,800 | May 17, 2021 |

All in violation of 26 U.S.C. § 7203.

## CRIMINAL FORFEITURE ALLEGATION(S)

### Fraud Forfeiture
### 18 U.S.C. §§ 981(a)(1)(D), 982(a)(2), and 21 U.S.C. § 2461

Upon conviction of the offenses alleged in Counts One through 14 of this Indictment, the defendant shall forfeit to the United States any and all property, real and personal, tangible and intangible, consisting or derived from any proceeds the said

INDICTMENT - 13

defendants obtained directly or indirectly as a result of the foregoing offenses. The property to be forfeited includes, but is not limited to, the following:

1. <u>Unrecovered Cash Proceeds and/or Facilitating Property.</u> The defendant obtained and controlled unrecovered proceeds of the offense of conviction, or property derived from or traceable to such proceeds, and property the defendant used to facilitate the offense, but based upon actions of the defendant, the property was transferred, diminished, comingled, or is otherwise unavailable. The defendants obtained and controlled at least $3.5 million in unrecovered forfeitable property.

2. <u>Substitute Assets.</u> Pursuant to 21 U.S.C. § 853(p) and other applicable statutes, the government will seek forfeiture of substitute assets, "or any other property of defendants" up to the value of the defendants' assets subject to forfeiture. The government will do so when the property subject to forfeiture cannot be forfeited for one or more of the following reasons:

   a. Cannot be located upon the exercise of due diligence;

   b. Has been transferred or sold to, or deposited with, a third person;

   c. Has been placed beyond the jurisdiction of the court;

   d. Has been substantially diminished in value; or

   e. Has been commingled with other property which cannot be subdivided without difficulty.

Dated this 21st day of October 2025.

A TRUE BILL

/s/ [signature on reverse]
_____

INDICTMENT - 14

                                            FOREPERSON

BART M. DAVIS
UNITED STATES ATTORNEY
By:

_____
BRITTNEY CAMPBELL
ASSISTANT UNITED STATES ATTORNEY

**INDICTMENT** - 15